UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:22-CV-00508-GNS-CHL

MARK W. EURTON, JR. et al.                                    PLAINTIFFS

v.

PARKER THOMAS et al.                                          DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motion for Summary Judgment (DN 35).
The motion is ripe for adjudication.

## I.    SUMMARY OF THE FACTS

On February 11, 2022, Defendants Parker Thomas ("Thomas") and Tyler Covington
("Covington"), both officers with Oldham County Police Department ("OCPD"), conducted a
welfare check on Plaintiff Mark W. Eurton, Jr. ("Eurton") after he reportedly made threats of
suicide and self-harm.  (Thomas Dep. 43:14-16, Feb. 22, 2024, DN 35-5; Defs.' Mot. Summ. J.
Ex. E, at 1, DN 35-6 [hereinafter Covington Report]).  Thomas and Kim Gunsett ("Gunsett")
were the initial officers dispatched, and Covington "self-initiated" to the incident to provide
assistance.  (Covington Dep. 38:9-11, Feb. 22, 2024, DN 35-4).  The dispatched officers were
advised that a previous officer had posted an alert on Eurton because he "does not like police and
will become violent."  (Covington Dep. 40:6-11).

When the officers arrived, Eurton's wife, Lauren Whisman ("Whisman"), was outside the
home crying, and Eurton was standing in the doorway holding a cigarette in one hand with the
other hand in his pocket.  (Defs.' Mot. Summ. J. Ex. J, at 1:12, DN 35-11 [hereinafter

"Covington Bodycam"]).  Thomas asked Whisman if she was "doing ok," and Whisman replied that she was not.  (Covington Bodycam 1:24-26; Thomas Dep. 33:15-16).  Eurton then quickly shut the door after Thomas asked him if he wished to speak with the officers.  (Covington Bodycam 1:33-40).  Thomas tried to stop the door from closing and said, "No, we aren't doing that. We're gonna talk."  (Covington Bodycam 1:33-40).  The door shut completely, and Thomas and Covington then broke open the door with force.  (Covington Bodycam 1:42-45).  Thomas noted he observed Eurton "reaching for his waist."  (Defs.' Mot. Summ. J. Ex. F, at 1-2, DN 35-7 [hereinafter Thomas Report]).  Thomas and Covington drew their weapons and ordered Eurton to show them his hands and slowly walk towards them; Eurton complied but questioned if the officers had a warrant.  (Covington Bodycam 1:45-2:05).  Defendants ordered Eurton to approach to be patted down, but he declined and instead took his phone out, stepping further into the house away from the officers.  (Covington Bodycam 2:25-32).  Defendants repeatedly explained that they were there to conduct a wellness check, but Eurton continued to inquire about a warrant.  (Covington Bodycam 2:45-53).  Defendants asked why Whisman was crying, and Eurton answered she thought he "did something stupid" because she saw three empty beer bottles on the table.  (Covington Bodycam 3:00-09).

Eurton yelled at Defendants to leave, moved further into the house, and continued to defy the orders to keep his hands out of his pockets, even challenging Defendants to shoot him. (Covington Bodycam 3:30-49).  Eurton loudly berated Defendants and warned that if the officers did not leave he would have "no choice but to defend himself" because they were breaking and entering.  (Covington Bodycam 6:04-7:00).  Defendants moved past the threshold of the home as Eurton went further into the house.  (Covington Bodycam 6:19-23).  Eventually Jared Ellison ("Ellison"), Thomas and Covington's supervisor, arrived at the scene and learned the details of

the ongoing situation.  (Covington Bodycam 12:26-35).  After Ellison assessed that Eurton was not a threat of harm to himself, the officers left the house.  (Covington Bodycam 15:00-15:07).

Meanwhile, Gunsett spoke with Whisman.  (Defs.' Mot. Summ. J. Ex. K, at 1:15-20, DN 35-13 [hereinafter Gunsett Bodycam]).  Whisman informed Gunsett that Eurton had several guns in the house, but she was not certain if he currently had a gun on him.  (Gunsett Bodycam 1:19-23).  It is unclear if Defendants knew about these firearms while their encounter with Eurton was taking place.  Whisman advised that she learned from Eurton's sister that Eurton had said he had taken pills to commit suicide.  (Gunsett Bodycam 2:20-32).  Whisman indicated that Eurton showed her two empty pill bottles and told her "the best thing" for her to do was to leave the house, and it would be the last time that she saw him.  (Gunsett Bodycam 15:59-16:42).  Before leaving the scene, the officers told Whisman that they could not act under the circumstances without a mental inquest warrant and advised her to stay elsewhere.  (Gunsett Bodycam 15:59-16:42; 22:26-23:30; Thomas Report 3).

Eurton and Whisman (jointly, "Plaintiffs"), initiated this action pursuant to 42 U.S.C. § 1983 asserting claims against Thomas and Covington (jointly, "Defendants") in their individual and official capacities for civil rights violations and state law claims.[1]  (Compl. ¶¶ 6, 49-96, DN 1).  The Court dismissed Plaintiffs' official capacity claims against Defendants leaving the claims against them in their individual capacities.  (Mem. Op. & Order 8).  Defendants now move for summary judgment as to the remaining claims.  (Defs.' Mot. Summ. J., DN 35).

---

[1] Plaintiffs initially asserted claims against Oldham County Fiscal Court, which were dismissed. (Compl. ¶¶ 5-6; Mem. Op. & Order 8, DN 11).

## II.    <u>JURISDICTION</u>

The Court exercises subject-matter jurisdiction over this action based upon federal question jurisdiction and supplemental jurisdiction over the state-law claims.  28 U.S.C. §§ 1331, 1367(a).

## III.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] party moving for summary judgment may satisfy its burden [of] show[ing] that there are no genuine issues of material fact simply 'by pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.'"  *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).  Similarly, the movant may meet its burden by offering evidence negating an essential element of the non-moving party's claim.  *See Dixon v. United States*, 178 F.3d 1294, 1999 WL 196498, at *3 (6th Cir. 1999).

After the movant either shows "that there is an absence of evidence to support the nonmoving party's case," or affirmatively negates an essential element of the non-moving party's claims, the non-moving party must identify admissible evidence that creates a dispute of fact for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  While the Court must view the evidence in a light most favorable to the non-moving party, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  "The mere existence of a

4

scintilla of evidence in support of the [moving party's] position [is] [ ] insufficient; there must be evidence on which the jury could reasonably find for the [moving party]." *Anderson*, 477 U.S. at 252.

When are the events of a case are captured on video or a bodycam, courts are to "view[] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). If the video evidence "can be interpreted in multiple ways or if [the] videos do not show all relevant facts, such facts should be viewed in the light most favorable to the non-moving party." *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017) (citation omitted). Furthermore, if "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment should be denied. *Anderson*, 477 U.S. at 250.

## IV.    DISCUSSION

### A.    Section 1983 Claims and Qualified Immunity

Plaintiffs have alleged Section 1983 claims for unlawful entry into their home, excessive force, and improper arrest/detainment, all arising under the Fourth Amendment. (Compl. ¶¶ 49-68). Defendants assert the affirmative defense of qualified immunity, contending that they acted with the appropriate level of force and violated no established constitutional right, and that they exercised a valid *Terry* stop. (Defs.' Mem. Supp. Mot. Summ. J. 9, 12, DN 35-1). The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Section 1983 does not provide substantive rights to a plaintiff but creates a mechanism for a remedy when there is a deprivation of a constitutional right or an otherwise established right. *See Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001). The Fourth Amendment allows a police

officer to conduct "temporary investigative detentions, known as *Terry* stops, so long as there is 'a reasonable suspicion supported by articulable facts'" that a person has engaged in or is about to engage in criminal activity.  *United States v. McCallister*, 39 F.4th 368, 373 (6th Cir. 2022) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968).

The Supreme Court has held that qualified immunity generally shields "government officials performing discretionary functions . . . for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982) (citations omitted). The Sixth Circuit has explained when qualified immunity applies to an officer's actions:

> Qualified immunity will ordinarily apply unless it is obvious that a reasonably competent official would have concluded that the actions taken were unlawful. The qualified immunity analysis is a two-step inquiry:    (1) whether a constitutional right has been violated; and (2) whether that right was clearly established, though the steps need not be taken in that order.   The clearly established step asks whether existing precedent placed the conclusion that the defendant violated the constitution under the circumstances beyond debate.

*Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (internal quotation marks omitted) (internal citations omitted) (citation omitted).   "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'"   *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original) (citation omitted).

The Sixth Circuit has explained that qualified immunity protects government officials from civil liability when their actions do not violate a clearly established constitutional or statutory right that a reasonable person would have known when acting in the course of their

professional duties. *See Getz*, 833 F.3d at 652 (citation omitted). Qualified immunity analysis begins by determining what constitutional rights may be implicated in the given case and the extent of the potential violation. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (citations omitted). A plaintiff has the burden of showing a defendant is not entitled to qualified immunity when a defendant raises the initial qualified immunity defense. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (citation omitted). A defendant must first provide facts showing that the actions taken were within his or her discretionary authority. *See Hartman v. Thompson*, No. 3:16-CV-00114-GNS-DW, 2018 WL 793440, at *7 (W.D. Ky. Feb. 7, 2018) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)). Defendants state that OCPD policies permitted them the discretion to make an arrest consistent with Sixth Circuit precedent. (Defs.' Mem. Supp. Mot. Summ. J. 2, 21-22; Defs.' Mem. Supp. Mot. Summ. J. Ex. M, at 1, DN 35-14); *see also Reich v. City of Elizabethtown*, 945 F.3d 968, 982 (6th Cir. 2019) (citation omitted). In this case, therefore, Defendants' determination to forcefully enter Eurton's house without a warrant was a discretionary act.

### B. **Unlawful Entry**

#### 1. *Constitutional Right Violation*

"[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585-86 (1980) (internal quotation marks omitted) (citation omitted). "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable government intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (internal quotation marks omitted) (citation omitted). A police officer's entry into a home without a warrant is presumptively

unconstitutional under the Fourth Amendment. *Barton v. Martin*, 949 F.3d 938, 948 (6th Cir. 2020) (citation omitted).

"[T]he Fourth Amendment does not prohibit all unwelcome intrusions on private property—only unreasonable ones." *Williams v. Maurer*, 9 F.4th 416, 431 (6th Cir. 2021) (internal quotation marks omitted) (citation omitted). An exigent circumstance permits an officer's warrantless entry into a home. *Barton*, 949 F.3d at 948. "Exigent circumstances exist when a reasonable officer could believe that there are real immediate and serious consequences that would certainly occur were a police officer to postpone action to get a warrant." *Id*. (internal quotation marks omitted) (citation omitted). The inquiry at this stage is whether a reasonable jury could find Defendants had an "objectively reasonable basis for believing that a 'a person within the house is in need of immediate aid.'" *Williams*, 9 F.4th at 431 (citations omitted). Whether exigent circumstances exist is "typically a question for the jury[,] [h]owever, the issue may be decided as a matter of law when a fact finder could only reach one conclusion on the undisputed facts." *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 358 (6th Cir. 2013) (citation omitted).

Defendants concede they entered Eurton's home without a warrant but contend that Defendants had probable cause and exigent circumstances that necessitated their entry. (Defs.' Mem. Supp. Mot. Summ. J. 10-11). "Probable cause [for an arrest] exists where 'the facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent person . . . in believing . . . that the suspect committed, is committing, or is about to commit an offense.'" *Smith v. City of Wyoming*, 821 F.3d 697, 715 (6th Cir. 2016) (alterations in original) (citation omitted). It is based on a "reasonable grounds for belief, supported by less than prima facie

proof but more than mere suspicion." *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005) (internal quotation marks omitted) (citation omitted).

A suspect who is an immediate threat to either an arresting officer or the public may create exigent circumstances. *Barton*, 949 F.3d at 948. The relevant analysis "is whether the facts are such that an objectively reasonable officer confronted with the same circumstances could reasonably believe that exigent circumstances existed." *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002) (citation omitted). The "'emergency aid exception' does not depend on the officers' subjective intent or the seriousness of any crime they are investigating when the emergency arises." *Williams*, 9 F.4th at 431 (citations omitted) (internal quotation marks omitted). "Rather, 'it requires only an objectively reasonable basis for believing that a person within the house is in need of immediate aid.'" *Id*. at 432 (citations omitted). The presence of a firearm in the home alone is not enough to create exigent circumstances, but "information that the suspect is armed and likely to use a weapon or become violent" can create exigent circumstances. *Barton*, 949 F.3d at 948-49 (internal quotation marks omitted) (citation omitted). This determination will not be based on "an officer's subjective fear that an individual has a weapon where objective indicia are absent." *Shumate v. City of Adrian*, 44 F.4th 427, 441-42 (6th Cir. 2022) (citation omitted). If a reasonable jury could conclude that there were no exigent circumstances, then there was a constitutional violation. *Reed v. Campbell Cnty.*, 80 F.4th 734, 743 (6th Cir. 2023) (citation omitted).

While it is not apparent when Defendants knew that Eurton owned and potentially had a firearm on his person, the totality of the circumstances reflects that Defendants still had an objectively reasonable basis to believe Eurton was in need of immediate aid or posed a danger to himself or others. (*See* Gunsett Bodycam 1:19-23). Before arriving, dispatch advised

Defendants of the need to conduct a wellness check due to Eurton's threats of suicide, that Eurton had a history of negative interactions with law enforcement, and that he could get violent. (Covington Dep. 40:6-11). As a sister court has noted:

> The Sixth Circuit has previously emphasized the important role of 911 calls in determining whether the emergency aid exception applies, stating "[t]he whole point of the 911 system is to provide people in need of emergency assistance an expeditious way to request it." *Johnson v. City of Memphis*, 617 F.3d 864, 870 (6th Cir. 2010) (citations omitted). "911 calls—while not determinative—are 'highly relevant' to the issue of exigency."

*Adamson v. City of Taylor*, No. 22-CV-12611, 2025 WL 975406, at *5 (E.D. Mich. Mar. 31, 2025) (alteration in original) (quoting *United States v. Goins*, No. 22-1201, 2022 WL 17078875 at *3 (6th Cir. Nov. 18, 2022)). The dispatcher's report of Eurton being potentially suicidal is very important here. As this Court has explained, "[t]he threat of suicide has been considered an exigent circumstance when 'there is a high risk of commit[ting] the dangerous act,' and the officer 'received information from a credible source, or sources, that an individual is a suicidal risk.'" *Lindsey v. Bailey*, No. 4:23-CV-10-DJH-HBB, 2025 WL 1467442, at *2 (W.D. Ky. May 22, 2025) (quoting *Ziegler v. Aukerman*, 512 F.3d 777, 785 (6th Cir. 2008)).

In light of the dispatcher's warning about Eurton's potential for violent behavior and negative interactions with law enforcement, his conduct also supports a finding of exigent circumstances. During the officers' interaction with Eurton, one of his hands was in his pocket, and he later reached into his waist, giving the appearance that he could be concealing a weapon.[2] (Covington Bodycam 1:12; Covington Report 1; Thomas Report 1). Eurton then quickly shut the door after being initially questioned, creating "real immediate and serious consequences" because of the potential for self-harm or violence directed at Defendants while Eurton was out of

---

[2] When the officers arrived and Thomas asked Whisman if she was "doing ok," she replied that she was not, which he understood as an indication of domestic violence. (Covington Bodycam 1:24-26; Thomas Dep. 33:15-16; Covington Report 1; Thomas Report 3).

sight from the officers. *Barton*, 949 F.3d at 948; (Covington Bodycam 1:33-40, 1:42-45; Thomas Dep. 33:11-20, 43:14-16; Covington Report 1; Thomas Report 1-2).

For these reasons, Defendants has a reasonably objective reasoning for entering the residence without a warrant due to exigent circumstances. Therefore, Defendants did not violate Eurton's Fourth Amendment rights by entering without a warrant.

### 2.    *Clearly Established*

While the Sixth Circuit has also found it unnecessary to undergo a clearly established analysis when there is not a constitutional violation, "it [i]s clearly established that warrantless entry into a home without an exception to the warrant requirement violate[s] clearly established law." *Baker v. City of Trenton*, 936 F.3d 523, 532 (6th Cir. 2019); *Barton*, 949 F.3d at 949 (citation omitted). Even if there was a constitutional violation, there is precedent that exigent circumstances permit an officer's warrantless entry. *See Thacker v. City of Columbus*, 328 F.3d 244, 254 (6th Cir. 2003). In a similar case, the Sixth Circuit found there were exigent circumstances to necessitate warrantless entry when a police officer entered a home without a warrant in response to a dispatch message that a domestic violence victim could be seen through a window. *Schreiber v. Moe*, 596 F.3d 323, 326, 328 (6th Cir. 2010). Here, the evidence is far less ambiguous as to what Defendants actually observed upon entering the property because of the report that Eurton had threatened suicide was known to be potentially violent.

Accordingly, Plaintiffs have shown neither a constitutional violation nor a clearly established constitutional principle underlying Defendants' warrantless entry. (Covington Bodycam 1:33-40; Thomas Dep. 33:11-20, 43:14-16; Covington Report 1). Defendants therefore are entitled to qualified immunity, and summary judgment is granted for Defendants as to the unlawful entry claim.

C.    **Excessive Force**

1.    *Constitutional Right Violation*

Plaintiffs' second claim is that Defendants acted with excessive force when Defendants drew their weapons and broke in the door.  (Pls.' Resp. Defs.' Mot. Summ. J. 21, DN 38). Fourth Amendment protections include a safeguard against an officer using excessive force during an arrest or a stop.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  A court utilizes the "objective reasonableness" standard when evaluating such an excessive force claim.  *See Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009) (citing *Graham*, 490 U.S. at 396).  This test asks "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 387 (citation omitted).  Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citation omitted).  "Although shows of force, such as the brandishing of weapons, are permissible when necessary to ensure the safety of the officers involved, . . . a show of force may constitute excessive force given the circumstances of the particular case . . . ."  *Bluedorn v. Wojnarek*, No. 3:07-CV-0839, 2008 WL 4791540, at *5 (M.D. Tenn. Oct. 29, 2008) (internal citation omitted) (citing *Davis v. Bergeon*, 187 F.3d 635, 1999 WL 591448, at *4-5 (6th Cir. 1999)).

Each defendant's liability must first be evaluated individually when there are multiple defendants.  *Pollard v. City of Columbus*, 780 F.3d 395, 402 (6th Cir. 2015) (citation omitted). "[A] plaintiff must prove that the officer (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force in order to hold an office liable for excessive force."  *Id.*

(internal quotation marks omitted) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)).  Covington and Thomas each concede that they responded to the incident, broke open Eurton's door, and entered the home.  (*See* Covington Report 1-2; Thomas Report 1-2).  There is no dispute of material fact as to Defendants' individual actions that give rise to Plaintiffs' Section 1983 claims.

A court undergoes this analysis by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (citation omitted).  It requires assessing the following factors:  "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).  When examining these factors, a court must identify a seizure and determine "whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances."  *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)).

In this case, the *Graham* analysis favors Defendants.  The first factor as to the severity of the crime is inconclusive.  In considering the severity of a crime, a series of factors are pertinent to determine if the crime is severe, including whether an offense is a misdemeanor or felony, whether the individual was suspected of being involved in an underlying felony or the officer was responding to an emergency call, and whether the suspect's conduct implicates public safety concerns.  *See Shumate*, 44 F.4th at 441-42.  Domestic violence can be a misdemeanor or felony offense depending on several factors.  *See* KRS 403.720, 508.030, 508.032, 533.060.

Defendants initially arrived on scene in order to conduct a wellness check because of Eurton's suicidal threats, but they also had cause to suspect domestic violence related to Whisman's behavior and statements.[3]   (Covington Bodycam 1:33-40; Thomas Dep. 33:11-20, 43:14-16; Covington Report 1).

The second factor, whether the suspect poses an immediate threat, clearly favors Defendants.  Eurton contends that being upset and disrespectful towards the officers is the only behavior he exhibited.  (Pls.' Resp. Defs.' Mot. Summ. J. 23).  The bodycam footage reflects, however, that Defendants were advised of Eurton's history of negative interactions with law enforcement and possible violent nature.  (Covington Dep. 40:6-11).  When Defendants arrived, they suspected domestic violence because Whisman was crying and told Thomas she was not ok.  (Covington Bodycam 1:24-26; Thomas Dep. 33:15-16).  Eurton also gave the officers cause for concern that he was armed since one of his hands was in his pocket, possibly concealing a weapon, and he reached for his waist after Defendants entered his house.  (Covington Bodycam 1:12; Covington Report 1; Thomas Report 1).  Eurton then quickly shut the door after being questioned about possible domestic violence and self-harm, creating a reasonable basis for Defendants to believe their lives or Eurton's life could be in immediate danger.  (Covington Bodycam 1:33-40; Thomas Dep. 33:11-20, 43:14-16; Covington Report 1).

Thomas and Covington had to break open the door with force and draw their weapons in order to neutralize a possible threat after seeing Eurton reach for his waist and pockets.  (Covington Bodycam 1:42-2:05; Thomas Report 1-2).  Drawing their weapons was certainly a show of force by Defendants, but in this context, it was not excessive force.  *Bluedorn*, 2008 WL

---

[3] Eurton was not suspected of a possible crime before Defendants' conversation with Whisman, so this factor is inconclusive.

4791540, at *5 (characterizing drawing a weapon as a show of force).  Based on the evidence presented, Defendants were reasonably justified in the belief that Eurton posed an immediate threat to the wellbeing of Defendants and himself.

The last factor is whether the suspect actively resisted or attempted to evade arrest.  The Sixth Circuit has identified active resistance where "some outward manifestation—either verbal or physical—on the part of the suspect had suggested volitional and conscious defiance . . . ." *Eldridge v. City of Warren*, 533 F. App'x 529, 534 (6th Cir. 2013).  Split-second decisions by officers are a key part of this analysis: "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Dickerson*, 101 F.3d at 1162 (quoting *Graham*, 490 U.S. at 396-97).  *Graham* instructs courts not to "allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day." *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992).

Eurton was not arrested, but he was detained under Defendants' concession that they conducted a *Terry* stop.  (Defs.' Mem. Supp. Mot. Summ. J. 12; Defs.' Reply Mot. Summ. J. 13, DN 40).  Eurton did, however, "actively resist" Defendants' commands trying to ascertain Eurton's mental wellbeing and any potential threats to themselves or to Eurton.  *See Eldridge*, 533 F. App'x at 534.  Eurton belligerently refused Defendants' orders to answer questions about potential self-harm, not put his hands in his pockets, and not move throughout the house. (Covington Bodycam 1:12, 2:45-53, 6:04-7:00; Covington Report 1; Thomas Report 1).  Eurton also refused to let Defendants pat him down for weapons.  (Covington Bodycam 2:25-32). Eurton even threatened Defendants at one point, stating that he would have "no choice but to

defend himself" because Defendants were "breaking and entering." (Defs.' Mot. Summ. J. Ex. I, at 6:04-6:08, DN 35-10 [hereinafter Thomas Bodycam]). Thomas holstered his weapon at one point in order to deescalate the situation between Defendants and Eurton. (Thomas Bodycam 6:05-6:08). Because Eurton's actions constituted active resistance, the third factor favors Defendants.

In sum, the *Graham* analysis shows that Defendants did not violate a constitutional right against excessive force.

### 2. *Clearly Established*

Even though the Sixth Circuit does not require analysis regarding whether a constitutional violation was clearly established analysis absent a constitutional violation, Plaintiffs have also failed to show that there was a clearly established precedent that Eurton could not be detained under these circumstances even if a right had been violated. Defendants did not violate clearly established law by breaking open the door, entering Eurton's home without a warrant, and drawing their weapons on Eurton when Defendants saw Whisman was upset outside the home and dispatch had warned them about a hostile and potentially violent situation. *Baker*, 936 F.3d at 532. Accordingly, Plaintiffs have shown neither a constitutional violation nor a clearly established constitutional principle under Defendants' warrantless entry. (Covington Bodycam 1:33-40; Thomas Dep. 43:14-16; Covington Report 1). Defendants are entitled to qualified immunity as to Plaintiffs' excessive force claim, and summary judgment is granted in their favor.

### D.      **Improper Detainment**

#### 1.      *Constitutional Right Violation*

An officer only needs "probable cause to believe that a criminal offense has been or is being committed" to support a warrantless arrest, or "a particularized and objective basis for suspecting [a] particular person of criminal activity" to support an investigatory stop.  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (citation omitted); *United States. v. Collazo*, 818 F.3d 247, 257 (6th Cir. 2016) (citation omitted).  "[W]arrantless seizures of persons in their homes violate the Fourth Amendment, absent exigent circumstances . . . regardless of whether the officers at issue were conducting an arrest or an investigatory detention."  *United States v. Saari*, 272 F.3d 804, 809 (6th Cir. 2001) (applying the holding in *Payton v. New York*, 445 U.S. 573, 590 (1980)).  In order for a wrongful arrest or detainment claim to succeed under Section 1983, a plaintiff must prove that an officer making a detainment or arrest lacked probable cause.  *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (citing *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002)).  Here, both parties agree Defendants did not have a warrant and drew their weapons after breaking the door open.  (Defs.' Mem. Supp. Mot. Summ. J. 9; Pls.' Resp. Defs.' Mot. Summ. J. 7-8).

Defendants contend that they had probable cause and are entitled to summary judgment; Plaintiffs assert to the contrary that defendant officers violated the Fourth Amendment by arresting them without probable cause.  (Defs.' Mem. Supp. Mot. Summ. J. 11-12; Pls.' Resp. Defs.' Mot. Summ. J. 17-19).  Defendants have provided evidence of specific and articulable facts upon which they relied to determine they had probable cause to arrest Eurton:  the bodycam footage supports Defendants' probable cause and refutes Eurton's version of the facts.  (*See* Defs.' Mem. Supp. Mot. Summ. J. 11-12).  As discussed above, Defendants had ample reasons

17

to detain Eurton as a *Terry* stop.  (Defs.' Mem. Supp. Mot. Summ. J. 12; Defs.' Reply Mot. Summ. J. 13).  Defendants were advised of a potentially dangerous situation because of the nature of the wellness check regarding threats of self-harm and Eurton's past hostile interactions with police.  (Covington Dep. 40:6-11).  Furthermore, Defendants had probable cause to investigate a possible domestic violence situation based on Whisman's statements and demeanor. (Covington Bodycam 1:24-26; Thomas Dep. 33:15-16).  Eurton also reacted rashly by quickly shutting the door after being initially questioned, while concealing a hand in his pocket that could have held a weapon.  (Covington Bodycam 1:12, 1:33-40; Thomas Dep. 43:14-16; Covington Report 1).

Plaintiffs have failed to meet their burden to establish that Defendants lacked probable cause.  Therefore, Plaintiffs have not established that Defendants violated their Fourth Amendment rights.

### 2.    *Clearly Established*

It is well settled that "a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed[,]" and "[t]he validity of the arrest does not depend on whether the suspect actually committed a crime . . . ." *Devenpeck*, 543 U.S. at 152 (citation omitted); *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).  It is also clearly established that exigent circumstances are required to enter a home in order to make an arrest without a warrant.  *See Reed*, 80 F.4th at 747.

As discussed earlier regarding unlawful entry, there were adequate exigent circumstances present to justify Defendants' entry to the home.  Plaintiffs cannot point to a constitutional violation nor a clearly established law that Defendants violated.  Accordingly, Defendants have qualified immunity and their motion for summary judgment is granted.

E.     **State Law Claims**

Defendants also move for summary judgment as to the tort claims against them under Kentucky law.  (Defs.' Mem. Supp. Mot. Summ. J. 2, 21-22).  Plaintiffs argue that Defendants violated KRS 431.025 and acted in bad faith.  (Compl. ¶¶ 90-96; Pls.' Resp. Defs.' Mot. Summ. J. 24-25).  KRS 431.025 states that "[t]he person making an arrest shall inform the person about to be arrested of the intention to arrest him, and of the offense for which he is being arrested" and "[n]o unnecessary force or violence shall be used in making an arrest."  KRS 431.025.  Under Kentucky law, public officials and employees have qualified official immunity from tort liability for "(1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of the employee's authority."  *Howell v. Sanders*, 668 F.3d 344, 355 (6th Cir. 2012) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001)).  Qualified official immunity protects officials who must exercise judgment and discretion from personal liability for damages in order to encourage the full performance of their necessary duties.  *New v. Louisville Metro Gov't*, No. 3:15-CV-653-DJH, 2016 WL 1268299, at *4 (W.D. Ky. Mar. 31, 2016) (citing *Haney v. Monsky*, 311 S.W.3d 235, 245 (Ky. 2010)).

As discussed above, Defendants were performing discretionary functions in their investigation and detainment of Eurton, not ministerial duties.  *See Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014) (stating that discretionary acts are those which "call[] for a 'good faith judgment call[] made in a legally uncertain environment.'" (quoting *Yanero*, 65 S.W.3d at 522)).  Furthermore, Plaintiffs' argument that Defendants violated KRS 431.025 fails because Defendants never arrested Eurton and made clear during the encounter their intention that Eurton was not under arrest.  (Covington Bodycam 4:16-56).

Because Defendants have demonstrated that that they acted within their discretionary authority, Plaintiffs must "establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523 (citation omitted). Under Kentucky law, the "good faith" component of qualified official immunity has "both an objective and subjective aspect." *Id.* (citing *Harlow*, 457 U.S. at 815). The objective aspect asks whether there was a "violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position." *Id*. This test mirrors the objective reasonableness standard of the qualified immunity analysis above, and it has already been determined that Defendants did not violate a clearly established constitutional right.

The subjective component of determining bad faith asks whether "the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive." *Id.* (citation omitted). Plaintiffs offer no specific evidence, just the naked assertion that Defendants cannot establish good faith. (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 23-24). This argument does not implicate "willfull[] or malicious[] inten[t]" nor "corrupt motive" required to show Defendants acted in bad faith.

The discussion of federal qualified immunity above details why Eurton's constitutional rights were not violated by Defendants' actions. Because Defendants were performing a discretionary function in good faith and within the scope of their authority, their actions are protected by qualified official immunity under Kentucky law. *See Howell*, 668 F.3d at 355 (citation omitted). Accordingly, Defendants have qualified immunity, and Defendants' motion for summary judgment is granted as to the state law claims asserted against them.

## V.     CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (DN 35) is **GRANTED**.  Plaintiffs' claims against Defendants Thomas and Covington in their individual capacities are **DISMISSED**.  The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge
United States District Court

July 14, 2025

cc:     counsel of record